**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| World Nutrition Incorporated, | No. CV-19-00265-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Advanced Enzymes USA, et al., | |
| Defendants. | |

Pending before the Court is Defendants and Counter-Complainants Advanced Supplementary Technologies Corp. ("AST") and Cal-India Foods International's ("Specialty") Motion for Partial Summary Judgment (Doc. 198) and Plaintiff World Nutrition Incorporated's ("WNI") Cross Motion for Partial Summary Judgment (Doc. 248). Also before the Court is WNI's Motion to Exclude Dr. Jason Clevenger's Testimony (Doc. 246). For the following reasons, the motions are granted in part and denied in part.[1]

## BACKGROUND

Plaintiff and Counter-Defendant WNI and Defendants and Counter-Complainants AST and Specialty sell enzyme supplement products. WNI and AST sell directly to consumers, while Specialty is a wholesaler that sells to other businesses, including AST.

---

[1] The parties requested oral argument. That request is denied because the parties have had an adequate opportunity to discuss the law and evidence and oral argument will not aid the Court's decision. *See Lake at Las Vegas Invs. Grp., Inc. v. Pac. Malibu Dev.*, 933 F.2d 724, 729 (9th Cir. 1991).

1    In this action, both parties assert that the other engaged in false advertising associated with
2    its products.  The primary allegations are that the parties each advertised their products as
3    containing enteric coating when they do not contain such coating.[2]  However, WNI also
4    asserts that AST falsely advertised in several other ways, including by advertising that AST
5    is a manufacturer, that it uses a Bioactive Protein Peptide System, that it employs a
6    formulator and master enzymologist, and that it conducts in-house laboratory testing.  AST
7    asserts that, in addition to falsely advertising its enteric coating, WNI falsely advertised its
8    products as containing buffer enteric coated serrapeptase, and falsely advertised the
9    efficacy of its two liquid products as well as its compliance with "Good Manufacturing
10   Practices" ("GMP"), as established by federal law.

11          Starting around 2000, WNI purchased an enzyme blend called Exclyzyme in bulk
12   from Specialty.  In 2002, a competitor of WNI, Marlyn Nutraceuticals, brought suit against
13   WNI for falsely advertising one of its products (sourced from Specialty) as containing
14   enteric coated serrapeptase.  WNI lost at trial and ceased purchasing products from
15   Specialty.

16          AST was established in 2010 and purchases enzyme blends for its products from
17   Specialty.  The parties dispute whether Specialty sells finished consumer products or
18   merely ingredients that AST further manufactures.  Nevertheless, WNI filed a Lanham Act
19   false advertising claim and an Arizona unfair competition claim against AST and Specialty
20   in 2019, claiming that they falsely advertise that their products contain enteric coating.
21   AST filed a counter claim, also under the Lanham Act and Arizona's unfair competition
22   law, asserting that WNI likewise falsely advertises its products as containing enteric
23   coating.  AST moved for summary judgment on several aspects of WNI's false advertising
24   and unfair competition claims, as well as its own claims.  WNI filed a motion to exclude
25   the testimony of AST's expert witness, Dr. Jason Clevenger, and a cross motion for
26   summary judgment.

27
28   _____
     [2] Enteric coating is a coating that protects an enzyme from the acidic environment of the
     stomach.  Enzymes are proteins that catalyze specific reactions, and that catalyzation is
     measured by the enzyme's activity.  Because certain enzymes react to acids in the stomach,
     enteric coating preserves the enzyme's activity until it reaches the small intestine.

1

2                                          **DISCUSSION**

3      **I.      Motion to Exclude**

4              **A. Legal Standard**

5      Pursuant to Federal Rule of Evidence 702,

6              A witness who is qualified as an expert by knowledge, skill,
               experience, training, or education may testify in the form of an
7              opinion or otherwise if:

8              (a)  the expert's scientific, technical, or other specialized
                    knowledge will help the trier of fact to understand the
9                   evidence or to determine a fact in issue;

10             (b)  the testimony is based on sufficient facts or data;

11             (c) the testimony is the product of reliable principles and methods;
                    and
12
               (d) the expert has reliably applied the principles and methods to
13             the facts of the case.

14     The Court acts as a gatekeeper to ensure the proffered testimony is both relevant

15     and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993). Expert

16     opinion testimony is reliable "if the knowledge underlying it has a reliable basis in the

17     knowledge and experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558,

18     565 (9th Cir. 2010).   When making this determination, the Court should consider

19     (1) whether the theory can be and has been tested, (2) whether the theory has been peer

20     reviewed and published, (3) what the theory's known or potential error rate is, and

21     (4) whether the theory enjoys general acceptance in the applicable scientific community.

22     *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995); *Murray v. S.*

23     *Route Mar. SA*, 870 F.3d 915, 922 (9th Cir. 2017).  However, these factors are not

24     exhaustive, nor are they "equally applicable (or applicable at all) in every case." *Daubert*,

25     43 F.3d at 1317. "Applicability 'depend[s] on the nature of the issue, the expert's particular

26     expertise, and the subject of his testimony.'" *Murray*, 870 F.3d at 922 (quoting *Kumho*

27     *Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)).

28             Expert opinion must also be "relevant to the task at hand" and "logically advance[]

a material aspect of the proposing party's case." *Daubert*, 43 F.3d at 1315. "Therefore, a federal judge should exclude scientific expert testimony under the second prong of the *Daubert* standard unless he is 'convinced that it speaks clearly and directly to an issue in dispute in the case.'" *Jones v. United States*, 933 F. Supp. 894, 900 (N.D. Cal. 1996), *aff'd*, 127 F.3d 1154 (9th Cir. 1997) (quoting *Daubert*, 43 F.3d at 1321 n.17)).

The Court is afforded broad discretion when acting in its gatekeeper role. *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000); *Kumho Tire*, 526 U.S. at 150-53. However, "Rule 702 should be applied with a 'liberal thrust' favoring admission." *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (quoting *Daubert*, 509 U.S. at 588). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564.

### B. Analysis

WNI moves to exclude the testimony of AST and Specialty's expert witness, Dr. Jason Clevenger on reliability grounds. Dr. Clevenger rendered opinions as to AST's marketing claims about serrapeptase and nattokinase as well as WNI's marketing claims about that its products retain 100% or nearly 100% of enzyme activity.

#### 1. AST's Nattokinase Enteric Coating

Dr. Clevenger's opinion on whether AST's nattokinase was enterically coated is excluded because of its unreliability. Dr. Clevenger did not conduct any testing on the nattokinase in isolation. Instead, he performed all testing on the serrapeptase and then concluded that the "effectiveness of enteric-coated serrapeptase is expected to extend to enteric-coated nattokinase based on the similarities between the enzyme ingredients and their enteric coating processes." (Doc. 246-1 at 82.) This conclusion is not based on reliable testing or methodology. Instead, it extrapolates from tests on a different substance, concluding that, at best, Dr. Clevenger "expects" that the nattokinase would behave the same way.

Dr. Clevenger accounts for this expectation by explaining why he could not test the

nattokinase individually.  Specifically, he explains that AST does not sell a standalone nattokinase product, so other enzymes would interfere with his attempt to test the enteric coating.  He further explains that instead of conducting such a test, he highlighted the similarities between the enzymes, including that they are "both serine protease enzymes that display proteolytic activity" and "both enzymes exhibit stability in neutral to alkaline conditions and can be denatured in acidic environments such as gastric fluid." (Doc. 246-1 at 82.)  In determining that the similarities between the enzymes would produce a similar result if tested, Dr. Clevenger also relied on "a representation from Defendants . . . [that] the enteric coating manufacturing process for nattokinase is equivalent to the serrapeptase enteric coating process." (*Id.*)

This methodology does not meet any of the *Daubert* reliability standards and the conclusions are, at best, speculative.  When considering reliability, the Court considers (1) whether the theory can be and has been tested, (2) whether the theory has been peer reviewed and published, (3) what the theory's known or potential error rate is, and (4) whether the theory enjoys general acceptance in the applicable scientific community. *Daubert*, 43 F.3d at 1317.  Although not all of the *Daubert* factors are relevant and applicable in every case, none of the factors appear to favor admitting Dr. Clevenger's conclusion about the enteric coating on AST's nattokinase.  He provides no specific theory for the assumption that nattokinase would respond to testing in the exact same way as the serrapeptase.  Therefore, there is no indication that his reasoning for treating the two interchangeably has been peer reviewed, published, or has a known error rate.  While he cites sources for the propositions that the two enzymes are similar, he does not appear to cite sources for the proposition that they would respond identically to testing in simulated gastric acid.  Moreover, he relied on representations from Defendants about the coating of nattokinase in forming his conclusion, rather than his own objective and reliable testing. Thus, Dr. Clevenger's opinion regarding AST's nattokinase relies heavily on an assumption, rather than his own objective testing.  While it is certainly plausible that enzymes with similar properties could react the same way under the same conditions, Dr.

Clevenger does not explain why that is so in this case.  As such, his opinion about the nattokinase is speculative and unreliable, and therefore excluded.

### 2.  Testing Using AET's Standard Analytical Procedure

Dr. Clevenger also measured enzyme activity using Advanced Enzyme Technologies Ltd.'s ("AETL") standard analytical procedure.  WNI argues that this model is unreliable because it is not a compendial model, has never been peer reviewed, and is an internal document to be used only by AETL.  Defendants provide that the procedure is "generally consistent with the assay described in the Japanese Pharmocopeia monograph for serrapeptase," but they do not explain whether or why Dr. Clevenger deviated from that procedure.  (Doc. 243 at 8-9; Doc. 246-1 at 96.)  If the test was wholly consistent with the Japanese Pharmocopeia model, which appears to be widely accepted, published, and peer-reviewed, it may be sufficiently reliable under *Daubert*.  However, if the test deviates from the otherwise accepted and published model, those deviations should be explained by Dr. Clevenger in a way that allows the Court to meaningfully assess the deviations, as was done with the Infogest Model.  While AST states in its response that "minor deviations" made by Dr. Clevenger are not relevant, it does not explain what those deviations were, and thus why they are not relevant.  (Doc. 243 at 9.)  In the absence of such an explanation, AST has not demonstrated that Dr. Clevenger's opinions based on his performance of AET's standard analytical test are reliable; thus, they are excluded.

### 3.  Testing Using the Infogest Model

Lastly, WNI challenges the testing that Dr. Clevenger performed based on the Infogest Model, arguing that he used and further modified an unreliable method.  These objections do not sufficiently undermine the reliability of Dr. Clevenger's opinion.

*Infogest Model:* First, WNI challenges the test on which Dr. Clevenger based his own testing model.  The Infogest Model, which Dr. Clevenger used as the starting point for his tests, is a food digestion model published in Nature Protocols designed to simulate gastrointestinal exposure.  WNI asserts that this model is unreliable because Dr. Clevenger had not heard of the model until after he was retained, Dr. Clevenger had no personal

knowledge of whether the Infogest Model was peer reviewed, and Dr. Clevenger did not review any of the articles that cited the Infogest Model.  These objections challenge Dr. Clevenger's personal knowledge of the *Daubert* factors as they relate to the model, but not the reliability of the model itself.  The test itself is published in Nature Protocols, which is a widely accepted journal in the scientific community.  The model is published as a "protocol," which is peer reviewed by anonymous peer reviewers.  (Doc. 243 at 7.)  Thus, nothing about the model is inherently unreliable; to the contrary, it is peer reviewed and widely accepted.

WNI argues that the Infogest Model is specifically a food digestion model and should not be used to test for enteric coating.  In this case, however, simulating digestion is the way Dr. Clevenger measured enzyme activity to evaluate whether WNI's products maintained 100% of enzyme activity through the digestive process.  AST challenges WNI's claims that its products ensure "nearly 100% of the enzymes survive the stomach's harsh acidic environment." (Doc. 198 at 2.)  To test the accuracy of that statement, Dr. Clevenger simulated subjecting WNI's products to the acidic environment of the stomach.  The fact that the model is typically used to simulate food digestion appears to be the purpose—not a flaw— in Dr. Clevenger's use of the model.  Thus, the fact that the Infogest Model is not typically used to test enteric coating does not make it unreliable.

*Dr. Clevenger's Modifications:* Next, WNI argues that even if the Infogest Model was reliable, Dr. Clevenger modified it in ways that undercut that reliability.  For example, Dr. Clevenger omitted four of the reagents typically used in the simulated digestion process.  These modifications are not without explanation;  Dr. Clevenger transparently explains the reasons for the modifications.  He omitted two of the reagents—pepsin and gastric lipase—"because of the high likelihood of background interference from these gastric enzymes with the downstream protease assay."  (Doc. 246-1 at 92.)  He omitted calcium carbonate to ensure that the final pH of the model was titrated to be exactly as the Infogest model requires.  (Doc. 246-1 at 21.)  And he omitted the salivary fluid because the products are swallowed in capsules and thus not exposed to saliva.  (Doc. 243 at 8.)

- 7 -

The Ninth Circuit has stated "a slight modification of an otherwise reliable method does not render expert testimony inadmissible." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1048 (9th Cir. 2014) (internal quotations omitted). This is so because "[a] more measured approach to an expert's adherence to methodological protocol is consistent with the spirit of *Daubert* and the Federal Rules of Evidence: there is a strong emphasis on the role of the fact finder in assessing and weighing the evidence." *Id.* In this case, Dr. Clevenger's modifications were a result of explained scientific reasoning. Therefore, the opinions are not unreliable. *See Takeda Pharm. Co. v. Twi Pharm., Inc.*, No. C-11-01609, 2013 WL 12164680, at *12 (N.D. Cal. May 20, 2013) (rejecting a challenge to expert opinion's reliability because expert modified a protocol to omit the use of a particular substance). Thus, Dr. Clevenger's modifications may be challenged on cross examination, but do not render his opinions from the Infogest Model testing inadmissible.

## II. Motions for Summary Judgment

### A. Standing Against Specialty

The Court previously dismissed Specialty's Lanham Act claim against WNI on standing grounds. (Doc. 131 at 7.) Now, Specialty moves for summary judgment on WNI's claims on the grounds that WNI does not have standing to assert a claim against it. To have standing under the Lanham Act, a plaintiff must show that it is in the "'zone-of-interests' and demonstrate proximate cause." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014). "[T]o come within the zone of interests in a suit for false advertising, . . . a plaintiff must allege an injury to a commercial interest in reputation or sales." *Id.* at 131-32. Under the proximate cause requirement, a plaintiff "must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising[, which] occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 133. The parties focus their dispute on the first element, whether WNI is within the zone of interests.

To determine whether a plaintiff has demonstrated "an injury to a commercial interest in sales or business reputation proximately caused by the defendant's

misrepresentation," the parties must "vie for consumers in the same market." *Lexmark*, 572 U.S. at 140; *Geiger v. Creative Impact Inc.*, No. CV-18-01443, 2020 WL 4583625, at *2 (D. Ariz. Aug. 10, 2020). Specialty alleges that "WNI and Specialty are not competitive in any market" because Specialty is a wholesaler and WNI sells directly to consumers. (Doc. 198 at 18.)

At an earlier stage of the litigation, WNI argued that Specialty did not have standing to assert a claim against WNI because "WNI and Specialty are not in the same market and they do not vie for the same dollars from the same consumers." (Doc. 114 at 9.) Now, WNI apparently changes course, alleging that "Specialty's argument that it is not competitive with WNI is disingenuine [sic]." (Doc. 248 at 19.) The only reasoning WNI offers is that "Specialty sells all of the AST Products to AST and others, who simply rebrand them and sell them as products that compete with the WNI Liquid Products." (*Id.*) This does not establish that Specialty and WNI are competitive; to the contrary, it shows that Specialty and WNI operate in two different markets. It is undisputed that (1) Specialty sells bulk enzymes and enzyme blends to other companies; (2) Specialty does not sell or advertise products directly to consumers; and (3) WNI sells enzyme products to consumers. (Doc. 199 ¶¶ 1, 50, 51.) As WNI itself noted in its previous motion to dismiss: "WNI's consumers are purchasers of its products. In contrast, 'Specialty manufactures bulk enzymes and probiotics, which are bought by other companies, including AST, who sells systemic enzyme products.'" (Doc. 114 at 9; *see also* Doc. 199 ¶ 50.) This means that Specialty and WNI do not vie for consumers in the same market, failing to meet the zone of interest test to establish standing under the Lanham Act.

WNI alternatively cites two cases standing for the propositions that individuals can be held vicariously liable for the copyright or trademark infringement of others. *See Fonavisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996); *Inwood Laby's, Inc. v. Ives Laby's, Inc.*, 456 U.S. 844 (1982). *Fonavisa* requires that the defendant exercise significant control over the infringers and receive a financial benefit from the sale. 76 F.3d at 262. Even if such a standard applied in the false advertising context, there is no evidence

in the record that Specialty exercised control over AST or its advertising.  *Inwood* requires that (in the trademark infringement context), "a manufacturer or distributor intentionally induces another to infringe a trademark" or "continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement."  456 U.S. at 854. Even if this standard applied in the false advertising context, and WNI provides no authority to suggest that it does, there is no evidence in the record to suggest that Specialty induced AST to falsely advertise or knew that AST was engaging in false advertising of its products.  WNI appears to allege that AST and Specialty "work together" to advertise their products and that Specialty advertises the AST products under different names.  (Doc. 248 at 20.)  However, WNI does not point to evidence anywhere in the record to support either of those assertions.  The mere existence of a supplier relationship does not give rise to vicarious liability.  Thus, WNI does not have standing to bring its Lanham Act claim against Specialty.

WNI's unfair competition claim against Specialty is similarly dismissed. Arizona's unfair competition law requires a plaintiff to "either show that it was engaged in competitive business with [defendant] or that [defendant's] actions were likely to produce public confusion."  *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 407 (internal citations omitted).  For the reasons noted above, WNI and Specialty do not engage in competitive business with one another.  Additionally, WNI does not offer any reason why Specialty's actions are likely to produce public confusion, especially when Specialty does not sell directly to consumers.

### B.  Unclean Hands

The doctrine of unclean hands "bars relief to a plaintiff who has violated conscience, good faith or other equitable principles in his prior conduct, as well as to a plaintiff who has dirtied his hands in acquiring the right presently asserted."  *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 173 (9th Cir. 1989).  To prevail on a defense of unclean hands, a defendant must demonstrate by clear and convincing evidence: (1) "that the plaintiff's conduct is inequitable," and (2) "that the conduct relates to the subject matter of

its claims." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987). Even if a defendant satisfies both requirements, however, a court should not automatically apply the doctrine of unclean hands and "permit a defendant wrongdoer to retain the profits of his wrongdoing merely because the plaintiff himself is possibly guilty of transgressing the law." *POM Wonderful LLC v. Coca Cola Co.*, 166 F. Supp. 3d 1085, 1092 (C.D. Cal. 2016). "Rather, determining whether the doctrine of unclean hands precludes relief requires balancing the alleged wrongdoing of the plaintiff against that of the defendant, and weighing the substance of the right asserted by the plaintiff against the transgression which, it is contended, serves to foreclose that right." *Northbay Wellness Grp., Inc. v. Beyries*, 789 F.3d 956, 960 (9th Cir. 2015) (cleaned up).

Here, each party relies on the merits of its own claims to demonstrate that the other party has unclean hands. The only material difference in their unclean hands defenses is the relief that they seek; AST asserts that WNI's unclean hands bar its claims entirely while WNI asserts that AST's unclean hands bar its assertion of laches. In any event, as explained in the remainder of this Order, there are genuine disputes of material fact underpinning most aspects of both party's claims, and therefore whether they have unclean hands. Specifically, to find that either party's conduct was "inequitable," as is required to find unclean hands, the Court would need to determine that a party engaged in the very conduct for which it brought the claim, i.e., engaged in false advertising.

The only statement for which it appears there is no genuine dispute of material fact as to its falsity is WNI's statement that its products contained buffer enteric coated serrapeptase. WNI admits that it advertised several of its products as containing "buffer enteric coated serrapeptase," which does not exist. (Doc. 199 at 2-3; Doc. 249 at 2.) However, even if these statements constitute inequitable conduct that relates to the subject matter of the claims, the Court cannot properly "balanc[e] the alleged wrongdoing of [WNI] against that of [AST]" while many disputes of fact remain for trial. *Northbay Wellness*, 789 F.3d at 960. It is possible that one party made substantially more significant false advertising claims than the other, but such a finding depends on facts and evidence

1    that will be presented at trial.  In light of that possibility, however, the Court will not

2    determine that unclean hands bars one or both parties claims before they have the

3    opportunity to demonstrate the extent of the other party's wrongdoing.  It would be

4    improper to use an equitable defense to produce a potentially inequitable result.  Therefore,

5    to the extent the motions seek summary judgment based on unclean hands, they are denied.

6            **C. Laches**

7            AST alleges that WNI's claims are time-barred under the doctrine of laches.

8    However, a party with unclean hands cannot assert laches.  *Jarrow Formulas, Inc. v.*

9    *Nutrition Now, Inc.*, 304 F.3d 829, 841 (9th Cir. 2002).  As noted above, on summary

10   judgment, the Court cannot determine the extent to which either party has unclean hands.

11   Therefore, given the possibility that AST has unclean hands, it cannot prevail on its laches

12   defense at this stage.  Determining that WNI's claims are barred by laches before

13   determining whether AST has unclean hands (and consequently may not assert laches)

14   could create an inequitable result.  As such, AST's motion for summary judgment based

15   on laches is denied.

16           **D. WNI's Advertising Statements**

17           Five elements are required to prove a false advertising claim under Section 43(a) of

18   the Lanham Act: (1) a false statement of fact by the defendant in a commercial

19   advertisement about its own or another's product; (2) the statement actually deceived or

20   has the tendency to deceive a substantial segment of its audience; (3) the deception is

21   material, in that it is likely to influence the purchasing decision; (4) the defendant caused

22   its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely

23   to be injured as a result of the false statement, either by direct diversion of sales from itself

24   to  defendant or by a lessening of the goodwill associated with its products.  *Skydive Ariz.,*

25   *Inc. v. Quattrocchi*, 673 F.3d 1105, 1110 (9th Cir. 2012).  The first element may be proved

26   by demonstrating that a claim is literally false or not literally false, but misleading.

27   *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139-40 (9th Cir. 1997).  If a

28   plaintiff proves literal falsity, then he is entitled to a rebuttable presumption of deception

1   and materiality.  *See Southland Sod*, 108 F.3d at 1140; *Avid Identification Sys., Inc. v.*
2   *Schering-Plough Corp.*, 33 F. App'x 854, 856 (9th Cir. 2002).

### 1.  Buffer Enteric Coated Serrapeptase

4   AST's motion for summary judgment is denied as to WNI's statements that their
5   products contained buffer enteric coated serrapeptase because genuine disputes of material
6   fact exist at least as to materiality.  There is no genuine dispute of material fact as to the
7   falsity of WNI's statements that their products contained buffer enteric coated serrapeptase.
8   In a previous order, this Court conclusively established that Plaintiff WNI advertised its
9   products Vitalzym Plus, Vitalzym X, Vitalzym Original Hybrid, and Vitalzym Cardio on
10  its website as containing butter enteric coated serrapeptase from August 1, 2016 through at
11  least May 18, 2021.  (Doc. 205 at 16.)  WNI does not contest that its products do not contain
12  buffer enteric coated serrapeptase as advertised (Doc. 199 ¶ 11) and buffer enteric coated
13  serrapeptase does not exist (Doc. 199 ¶ 12).  The statements are thus literally false.

14  Nevertheless, a genuine dispute of material fact exists with regard to the materiality
15  of the statement.  While AST is entitled to a presumption of materiality, WNI introduces
16  facts sufficient to rebut the presumption at summary judgment.  First, WNI argues that
17  because the products are digestive enzymes, which do not require enteric coating at all, the
18  statement was meaningless.  This, thus, could conceivably rebut either deception or
19  materiality.  Additionally, WNI argues that because the products at issue are its digestive
20  products, they do not compete with AST's products, which are systemic products, thereby
21  failing to meet the likely to cause harm element.  AST does not respond to these arguments,
22  stating that it "does not need to establish any additional elements of its counterclaim . . . to
23  establish WNI's liability."  (Doc. 198 at 21.)  As noted above, however, the presumption
24  is a rebuttable presumption.  Because Plaintiff offers facts that create a genuine dispute as
25  to other elements of the claim, summary judgment is denied.

### 2.  100% Survival

27  AST's motion for summary judgment on WNI's statements that 100% or nearly
28  100% of the enzymes survive the harsh environment of the stomach is denied because

genuine disputes of material fact exist as to the falsity of the statements. While AST's expert witness Dr. Clevenger opines that only 9% of enzyme activity remains in WNI's products, WNI's expert witness Dr. Savello opines that Dr. Clevenger's approach was improper and that the "Vitalzym enteric coated products . . . adequately protect the serrapeptase from the stomach contents." (Doc. 250-16 at 70.) This creates a genuine dispute of material fact for the jury, not the Court, to decide. Moreover, AST does not address any of the remaining elements of a false advertising claim based on these statements, including materiality or deception. Thus, summary judgment is denied.

### 3. GMP Compliance

AST's motion for summary judgment as to WNI's statements about Good Manufacturing Practices ("GMP") compliance is denied because a genuine dispute of material fact exists as to several elements of the false advertising claim. It is undisputed that WNI uses several symbols and abbreviations on their packaging, including (1) a GMP+ symbol, which represents the safety of animal feed; (2) a symbol from a third-party auditing company named NSF; and (3) generic GMP symbols adjacent to statements about quality control. (Doc. 198 at 31-32.) It is not clear whether AST seeks to prove that the GMP-related symbols are literally false or misleading. While AST alleges the symbols convey that the products themselves are high quality and safe, WNI alleges that the symbols indicate that the products are manufactured in GMP compliant facilities. (Doc. 199 ¶ 21; Doc. 249 ¶ 21.) In any event, however, it is for the jury to determine, in light of the context, what message the GMP symbols convey and, therefore, if the inclusion of the symbols is a false statement. Further, even if these statements are false or misleading, AST does not show there is no dispute of material fact as to the deception and materiality elements. Therefore, summary judgment on these statements is improper.

### E. AST's Advertising Statements

#### 1. Statements Not Pleaded

WNI's motion for summary judgment is denied insofar as it seeks summary judgment on issues not pleaded in the Second Amended Complaint ("SAC") (Doc. 86).

WNI moves for summary judgment on its claims that the following statements are false advertising under the Lanham Act and Arizona's unfair competition law: (1) that AST is a manufacturer of enzymes and the AST products; (2) that AST manufactures the AST products using a bioactive protein peptide system ("BPPS"); (3) that AST employs a "Formulator" and "Master Enzymologist"; and (4) that AST conducts in-house laboratory testing.  (Doc. 248 at 24.)

Under the liberal rules of pleading, a plaintiff need only provide a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  "Federal Rule of Civil Procedure 8(a)(2) requires that the allegations in the complaint give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006).  AST correctly alleges that "WNI only pleads that advertising statements regarding the AST products containing enteric coated serrapeptase and nattokinase are false."  (Doc. 238 at 19.)  WNI references enteric coating in over half the paragraphs in its SAC, setting the focus of the lawsuit squarely on the enteric coating of AST's serrapeptase and nattokinase products.  Additionally, WNI's SAC repeatedly states that AST's statements about the enteric coating on its products are false.  (Doc. 86 ¶¶ 34, 36) ("AST does not enterically coat its capsules. . . . Upon information and belief, the AST products do not contain enterically coated Serrapeptase or enterically coated Nattokinase.").  Further, WNI states that AST is making "false and misleading descriptions/statements of fact or false or misleading representations of fact, i.e., that the AST Products contain enterically coated Serrapeptase or enterically coated Nattokinase."  (Doc. 86 ¶ 36.)

While these statements undoubtedly put AST on notice that WNI's false advertising claim concerns the enteric coating of its products, they fail to notify AST that the claims concern the additional statements that WNI now raises on summary judgment.  WNI does not state anywhere in its SAC that it believes any of the four statements listed above are false.  The first two statements are at least referenced in the SAC.  WNI states several times that AST and Specialty represent themselves as manufacturers of enzymes; however, these

statements are in the context of block quotes from Defendants' websites.  WNI does not state in the SAC that it challenges the veracity of those statements in its false advertising claim.  The statement that AST uses a BPPS system appears once in the SAC, also in the context of reciting a statement straight from AST's website.  WNI likewise does not challenge the veracity of the statement in the SAC.  The remaining two statements regarding AST's employment of a formulator and AST's in-house laboratory testing do not appear at all in the SAC.

WNI points to three documents that purport to provide AST notice of the false advertising claims that extend beyond the enteric coating of its products.  First, it points to the SAC.  As noted above, the SAC, while including some of the statements, does not indicate that the statements were allegedly false or form the basis of the false advertising claim.  Second, it points to summary judgment documents.  Documents on summary judgment cannot be the basis of providing AST notice of the claims against it; the question is whether AST received sufficient notice of the claims prior to summary judgment.  *See Pickern*, 457 F.3d at 969.  Last, Plaintiff cites to its responses in discovery, but does not attach the interrogatory response to which it cites.[3]  As such, these documents do not provide sufficient notice to AST and WNI's motion for summary judgment as to these statements is denied.

## 2.  Enteric Coated Serrapeptase

WNI's motion for summary judgment as to its claims that AST made false advertising statements about enteric coated serrapeptase is denied because a genuine dispute of material fact exists as to several elements of the false advertising claim, including falsity.  Neither party establishes on summary judgment that there is no genuine

---

[3] Even if WNI accurately represents the interrogatories in its briefing, they, at most, concern two of the four statements on which WNI moves for summary judgment.  Still, the statements that WNI purportedly identified in its interrogatories (that AST is a "leading enzyme manufacturer;" that "AST is a true enzyme manufacturer;" and that "AST's supplements are manufactured in ISO 9001:2000 and GMP-certified facilities using our Bioactive Protein Peptide System, a manufacturing process that improves enzyme absorption, stability and bioavailability") are not the statements for which it seeks summary judgment.  For example, while AST was perhaps on notice that WNI challenged the truth of the statement that it was a "leading" enzyme manufacturer, it does not hold that AST was on notice that WNI challenged whether AST was a manufacturer of its products at all.

1   dispute of material fact as to the enteric coating; to the contrary, there are several.  For

2   example, AST asserts that all of its products contain enteric coated serrapeptase.  (Doc.

3   199 at 11.)  WNI responds that Dr. Savello's testing shows that the AST products fail the

4   United States Pharmacopeia (USP) test for enteric coated capsules and highlights the

5   relatively low percentage of remaining enzyme activity in the testing of AST's products.

6   (Doc. 248 at 9.)  The parties demonstrate genuine disputes about how much or little weight

7   to afford Dr. Clevenger's testing and the fact the USP test is for capsules (rather than

8   granules).  Likewise, the extent to which the tests demonstrate that the products could fairly

9   be said to contain enteric coating are fact questions for the jury, and thus summary

10  judgment is improper.

11                    **3.  Enteric Coated Nattokinase**

12          WNI's motion for summary judgment on AST's statements about enteric coated

13  nattokinase is denied because a genuine dispute of material fact exists as to several

14  elements of the false advertising claim.  First, a genuine dispute of material fact exists as

15  to the falsity of AST's claims.  It is unclear whether WNI disputes if and when AST stopped

16  producing nattokinase with enteric coating.  AST states that, at some point in 2016, it

17  stopped using enteric coating on nattokinase in the product Serracor-NK and modified its

18  advertising accordingly.

19          WNI argues that AST continued to advertise Serracor-NK as containing enteric

20  coated nattokinase even during the time period in which it admittedly did not.  This raises

21  a genuine dispute of material fact.  Specifically, during that time frame, AST advertised

22  Serracor-NK as containing "enteric coated serrapeptase and nattokinase."  (Doc. 238 at

23  26.)  After it allegedly resumed the enteric coating, AST changed the advertising to say

24  Serracor-NK contains "enteric-coated serrapeptase and enteric-coated nattokinase." (Doc.

25  238 at 25.)  AST claims that phrase "enteric coated" modifies only serrapeptase during that

26  time period, while WNI claims that the phrase applies to both serrapeptase and nattokinase.

27  Whether the phrase "enteric coated" in its previous advertising applies to serrapeptase and

28  nattokinase or applies only to serrapeptase is an issue of fact that a jury must resolve.

WNI points to other advertising statements, such as a statement that "the serrapeptase and nattokinase in Serracor NK are enterically coated." (Doc. 230 at 9.) AST asserts that these statements were located "buried in [two] additional informational tabs and a blog post" that "AST apparently [ ] did not revise." (Doc. 238 at 26.) Even if this suggests that a small proportion of AST's marketing did falsely advertise enteric coated nattokinase, WNI does not provide any support for several of the remaining elements of the false advertising claim aside from merely reciting them and stating that they are met. (Doc. 248 at 23 ("[T]he statements deceive the consumer about the AST Products; the statements are likely to and intended to influence the purchasing decision; . . . WNI is likely to be injured as a result of the false statements, i.e., WNI is the 'competition.'")). Because AST demonstrates sufficient facts to challenge the deception and materiality elements (namely, the limited instances of the phrase on old or "buried" webpages), summary judgment is improper on AST's statements about its nattokinase products.

## CONCLUSION

Accordingly,

**IT IS THEREFORE ORDERED** that WNI's Motion to Exclude the Testimony of Dr. Clevenger (Doc. 246) is **GRANTED** in part and **DENIED** in part. It is granted as to his opinions about the efficacy of AST's enteric coated nattokinase and his opinions based on using AETL's standard analytical procedure. It is denied as to the remainder of his opinion.

**IT IS FURTHER ORDERED** that AST and Specialty's Motion for Partial Summary Judgment (Doc. 198) is **GRANTED** in part and **DENIED** in part. It is granted as to WNI's claims against Specialty. It is denied on all other grounds. Therefore, WNI's remaining claims are its Lanham Act Claim (Count I) and Unfair Competition Claim (Count II) against AST.

/ / /

/ / /

**IT IS FURTHER ORDERED** that WNI's Cross Motion for Partial Summary Judgment (Doc. 248) is **DENIED**.  All of AST's counterclaims against WNI remain.  A separate order setting a final pretrial conference will issue shortly.

Dated this 20th day of June, 2023.

G. Murray Snow
Chief United States District Judge